EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<span style="color:red">*CERTIFIED COPY*</span>

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Change of Plea** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 17-00114JST |
| | ) | |
| SHIV D. KUMAR, | ) | Pages 1 - 25 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Friday, March 24, 2017 |

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

<u>APPEARANCES:</u>

For Plaintiff:  Brian J. Stretch, Esq.
                United States Attorney
                1301 Clay Street, Suite 340S
                Oakland, California  94612
            BY: JOSE APOLINAR OLIVERA,
                Assistant United States Attorney


For DEFENDANT:  Patton, Wolan & Carlisle LLP
                18477 Fitzpatrick Lane
                Occidental, California  95465
            BY: ROGER W. PATTON, ATTORNEY AT LAW


Reported By:    Raynee H. Mercado
                CSR. No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 1

```
 1    Friday, March 24, 2017                          9:39 a.m.
 2                    P R O C E E D I N G S
 3           THE CLERK:  Calling criminal case 17-114, United
 4    States of America versus Shiv D. Kumar.
 5        Counsel, will you please make your appearances.
 6           MR. OLIVERA:  Good morning, Your Honor.  Jose Olivera
 7    for the United States.
 8           THE COURT:  And --
 9           MR. PATTON:  And good morning, Your Honor.  Roger
10    Patton for Mr. Kumar, who's present.  And also Christopher
11    Cannon is co-counsel in this.  I think he may be delayed a
12    little bit, but we can proceed with myself.
13           THE COURT:  All right.  Very good.
14        Good morning to both of you.  Good morning, Mr. Kumar.
15        I'm understanding that Mr. Kumar is prepared to change his
16    plea this morning, Mr. Patton; is that true?
17           MR. PATTON:  That is true, Your Honor.
18           THE COURT:  Okay.  Mr. Kumar, can you hear me okay?
19           THE DEFENDANT:  Yes.  Yes, Your Honor.
20           THE COURT:  In just a minute, my courtroom deputy's
21    going to ask you to raise your right hand, and he'll
22    administer an oath and I'll ask you some questions.
23        Before that happens, I just want to tell you that the main
24    purpose of this hearing that we're having is not for me to
25    find out what the terms of the change of plea are or to put
```

1    those on the record.  I read the plea agreement before I took

2    the bench, so I know all about that.

3        The purpose of the hearing is for me to make sure that

4    you've had enough time to do the thinking and reading and

5    talking to Mr. Patton that you need to do to make a good

6    decision.  Okay?

7            **THE DEFENDANT:**  Yes, sir.

8            **THE COURT:**  And to make sure that you know what

9    you're getting out of this plea agreement and what you're

10    giving up, what the rights you're giving up and so forth.

11    Okay.

12            **THE DEFENDANT:**  Yes, Your Honor.

13            **THE COURT:**  So consistent with that, probably the

14    most important thing this morning is that you hear and

15    understand everything that's going on.  So that means if you

16    don't hear something that I say or one of the lawyers says,

17    will you please interrupt me or have Mr. Patton interrupt me

18    so it could be repeated?

19            **THE DEFENDANT:**  Yes, Your Honor.

20            **THE COURT:**  If you don't understand something at any

21    time, don't be bashful.  I need you to interrupt me or have

22    Mr. Patton interrupt me so whatever it is can be repeated or

23    explained.  Okay?

24            **THE DEFENDANT:**  Okay, Your Honor.

25                (Pause in the proceedings.)

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 3

1          **THE COURT:**  And then last thing is it may happen

2     during this hearing that you have a question about something

3     or for some other reason you want to talk to Mr. Patton.  And

4     if that happens, that's perfectly fine.  I don't need to know

5     the reason.  In fact, I don't want to know the reason.  All

6     you have to do is say, "I'd like to talk to my lawyer," and

7     you and Mr. Patton can step away from the microphone and have

8     a private conversation that no one else can hear and you can

9     take as long as you need.

10        And then when you're done, you can come back to the

11    microphone and we'll finish this hearing.  Okay?

12         **THE DEFENDANT:**  Thank you, Your Honor.

13         **THE COURT:**  I have in front of me a printout of the

14    parties' signed plea agreement.

15        Is the original somewhere here in the courtroom?

16         **MR. OLIVERA:**  Well, Your Honor, this -- the copy

17    here -- these are all copies.  We were exchanging signature

18    over email.  We don't have the actual original, but we could

19    sign an original for the court if the court would like.

20         **THE COURT:**  What we need -- the wet-ink signatures

21    don't have to all be on the same page.  This happens all the

22    time in agreements that parties will exchange.  Wet ink or

23    blue ink, a signature page.

24        But I do think that to eliminate any doubt, the copy in

25    the court's records should have a wet ink signature from

1  Mr. Patton or Mr. Cannon, one from you and one from you,

2  Mr. Kumar.

3       **MR. OLIVERA:**  Yes, Your Honor.  And I can -- we can

4  do that now.

5       **THE COURT:**  Okay.  Terrific.

6     While, Mr. Olivera is doing that, Mr. Kumar, would you

7  raise your right hand, please.

8                    (Defendant sworn.)

9       **THE COURT:**  Okay.

10                   (Off-the-record discussion.)

11      **THE COURT:**  I was about to say that very thing.

12    Mr. Kumar, you can be a little soft spoken and Ms. Mercado

13  is a terrific court reporter, but she needs to be able to

14  hear.

15    Mr. Kumar, do you understand that you're now under oath?

16      **THE DEFENDANT:**  Yes.

17      **THE COURT:**  And that if you answered any of my

18  questions falsely, you could be prosecuted for perjury or

19  making a false statement?

20      **THE DEFENDANT:**  I understand, Your Honor.

21      **MR. PATTON:**  Your Honor, if I may interrupt just to

22  have him sign this.

23      **THE COURT:**  Absolutely.

24      **MR. PATTON:**  And this is --

25                   (Off-the-record discussion.)

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 5

```
 1                    (Pause in the proceedings.)
 2          MR. PATTON:  All right, Your Honor.  He has signed
 3    it, and I'm going to date it for him as of March 24th, '17.
 4       You may proceed, Your Honor.
 5          THE COURT:  Thank you, Mr. Patton.
 6       Mr. Kumar, would you please state your full name for the
 7    record.
 8          THE DEFENDANT:  Shiv, S-h-i-v, initial D, last name
 9    Kumar, K-u-m-a-r.
10          THE COURT:  Mr. Kumar, where were you born?
11          THE DEFENDANT:  I'm born in India, January 2nd, 1957.
12          THE COURT:  All right.  And are you a United States
13    citizen?
14          THE DEFENDANT:  Yes, Your Honor.
15          THE COURT:  Mr. Kumar, how far did you go in school?
16          THE DEFENDANT:  Eighth grade pass.
17          THE COURT:  Beg your pardon?
18          MR. PATTON:  Eight?
19          THE DEFENDANT:  Eighth grade pass.  Eight grade in
20    India.
21          THE COURT:  Okay.  And you are you -- have your own
22    business.
23          THE DEFENDANT:  Yes, Your Honor.
24          THE COURT:  Now you been running that business
25    successfully for many years.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 6

1        **THE DEFENDANT:**  Yes, Your Honor.

2        **THE COURT:**  I take it from that that your reading and

3  writing is strong; is that true?

4        **THE DEFENDANT:**  Yes, Your Honor.

5        **THE COURT:**  Okay.

6        **THE DEFENDANT:**  You can say -- yes.

7        **THE COURT:**  Have you had any difficulty reading any

8  of the documents in this case?

9        **THE DEFENDANT:**  No, Your Honor.

10        **THE COURT:**  Okay.

11     Have you been treated recently for any mental illness or

12  addiction to alcohol or drugs of any kind?

13        **THE DEFENDANT:**  No, Your Honor.

14        **THE COURT:**  And right.  Now, this morning, are you

15  under the influence of any drug, medication, or alcohol?

16        **THE DEFENDANT:**  No, Your Honor.

17        **THE COURT:**  I want to show you just a couple

18  documents.  The first one is called "the information."  I'll

19  hold it up so you know, what I'm talking about (indicating).

20     This is the written charges against you in this case.  Did

21  you get a copy of information in the case?

22        **THE DEFENDANT:**  Yes, Your Honor.

23        **THE COURT:**  Have you read it?

24        **THE DEFENDANT:**  Yes, Your Honor.

25        **THE COURT:**  Have you fully discussed the charges

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 7

```
1    against you and the case in general with Mr. Patton?
2              THE DEFENDANT:  Yes, Your Honor.
3              THE COURT:  Have you had enough time to talk to
4    Mr. Patton about your case before deciding to change your
5    plea?
6              THE DEFENDANT:  Yes, Your Honor.
7              THE COURT:  Have you been fully satisfied with the
8    counsel representation and advice that Mr. Patton has given
9    you?
10             THE DEFENDANT:  Yes, Your Honor.
11             THE COURT:  The other document we need to discuss
12   briefly is the plea agreement.  And the signed original of
13   that has just been handed up to me, so before I forget, let me
14   just show you the signature page.  There are three names on
15   that page.  The top one is yours (indicating), and there's a
16   blue ink signature there.
17      Is that your signature?
18             THE DEFENDANT:  Yes, Your Honor.
19             THE COURT:  And did you place your signature on this
20   agreement this morning here in court?
21             THE DEFENDANT:  Yes, Your Honor.
22             THE COURT:  Did you have an opportunity to read and
23   discuss the plea agreement with Mr. Patton before you signed
24   it?
25             THE DEFENDANT:  Yes, Your Honor.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

EXHIBIT 1
Page 8

1    **THE COURT:** In fact, you signed an -- a different

2 copy of the same agreement some days ago. This isn't

3 something that you just saw for the first time today, true?

4      (Off-the-record discussion.)

5    **THE COURT:** He said, "Yes, that's correct."

6    **THE DEFENDANT:** Yes.

7    **THE COURT:** Does this plea agreement set out the

8 entirety of your understanding with the government?

9    **THE DEFENDANT:** Yes, Your Honor.

10    **THE COURT:** So there are no side deals; no one made

11 you any promises that are not in here?

12    **THE DEFENDANT:** No.

13    **THE COURT:** And you didn't make any promises to

14 anybody that are not in here?

15    **THE DEFENDANT:** No.

16    **THE COURT:** Okay. Sometimes -- Here's what I'm

17 worried about. It's never happened so far, but what I want to

18 make sure doesn't happen is the parties have a plea agreement

19 and then the government says to somebody on the side, you

20 know, if you sign that plea agreement, we'll do this other

21 thing for you.

22    **THE DEFENDANT:** No.

23    **THE COURT:** There's nothing like that here.

24    **THE DEFENDANT:** No. No, Your Honor.

25    **THE COURT:** Okay.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 9

1    Do you understand the terms of this plea agreement?

2         **THE DEFENDANT:**  Yes, Your Honor.

3         **THE COURT:**  Has anybody threatened you in any way to

4    try to convince you to accept the plea agreement?

5         **THE DEFENDANT:**  No, Your Honor.

6         **THE COURT:**  Now, there are two different kinds of

7    plea agreement, and the kind that you signed allows the

8    parties, meaning you and the prosecutor, to make a

9    recommendation to me about a sentence.  But I don't have to

10   follow that recommendation.

11   Do you understand that?

12        **THE DEFENDANT:**  Yes, Your Honor.

13        **THE COURT:**  So what will happen, and we'll talk about

14   the sentencing guidelines in a minute, but what will happen is

15   if we go through with this -- this plea agreement this morning

16   is you'll plead guilty, and later on, there'll be a separate

17   hearing where I have to determine what a good sentence is.

18   Mr. Patton will make a recommendation.  Mr. Olivera or

19   another prosecutor will make a recommendation.  I could follow

20   one of those recommendations or I could do something else.

21   But the point is that even if the sentence is higher than

22   what you thought it was going to be, if it's a lawful

23   sentence, you cannot withdraw your plea at that time.

24   Do you understand that?

25        **THE DEFENDANT:**  I understand, Your Honor.

1    **THE COURT:**  This crime that you are prepared to plead

2    guilty to is a felony, and so that's going to take away

3    probably certain valuable civil rights that you have as a

4    United States citizen, such as the right to vote, the right to

5    hold public office, the right to serve on a jury, and the

6    right to possess any kind of firearm.

7         Do you understand that?

8              **THE DEFENDANT:**  Understand, Your Honor.

9              **THE COURT:**  Mr. Olivera, would you please state the

10   maximum possible penalties provided by law and any mandatory

11   minimum penalty for this crime.

12             **MR. OLIVERA:**  Yes, Your Honor.

13        The maximum penalties, the statutory penalties, for making

14   and subscribing false tax return in violation of 26 USC 72061

15   are as follows:  Three years in prison; $250,000 fine or twice

16   the gain or loss from the offense, whichever is greater; one

17   year supervised release; a hundred -- and a $100 special

18   assessment; and potential deportation, Your Honor.

19             **THE COURT:**  All right.

20        And, Mr. Kumar, you're also subject to restitution which

21   means you'd be required to pay back the United States

22   government any money that -- that you took by failing to

23   accurately report your income or your business's income.

24        Do you understand the possible consequences of a plea that

25   we've gone over so far?

1          **THE DEFENDANT:**  Yes, Your Honor.

2          **THE COURT:**  We talked just a second ago about a

3    sentence in the case.  The sentence when -- When federal

4    judges impose a sentence, there are two main things they have

5    to consider.  The first one is the United States Sentencing

6    Guidelines.

7       Have you talked about the guidelines with Mr. Patton?

8          **THE DEFENDANT:**  Yes, Your Honor.

9          **THE COURT:**  If way -- Well, then you already know

10   what I'm about to say.  But the way the guidelines work is for

11   every federal crime, there is a range of suggested sentences

12   that the Sentencing Commission publishes every year.  And the

13   range goes up if somebody -- the more serious someone's

14   criminal history is.

15      So there are two things the judge has to look at, what's

16   the range for that crime, and what's the person's criminal

17   history.

18      That range is not binding on me, but I'm required to start

19   there in calculating any sentence.  And as I said a moment

20   ago, it's expressed as a range, so a range of a certain number

21   of months.

22      As I sit here right now, I don't have any idea what the

23   appropriate sentencing range in your case is even though

24   there's a calculation that's set out in the plea agreement.

25      And the reason for that is it's not -- I'm not able to do

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 12

```
1    a sentencing guidelines calculation until I've gotten the
2    probation report and read all the facts in there and looked at
3    their calculation, and then I can do my own calculation.
4         Do you understand all that?
5              THE DEFENDANT:  Yes, Your Honor.
6              THE COURT:  And do you understand that as I sit here
7    right now, I don't have any idea what an appropriate sentence
8    in your case is?
9              THE DEFENDANT:  I understand.
10             THE COURT:  The other thing I have to look at is a
11   statute -- is a law called 18 United States Code Section
12   3553(a).  That sets out a bunch of factors I have to look at,
13   so I can't just impose the Sentencing Guidelines sentence.  I
14   need think about the factors for this particular defendant,
15   meaning you, and this particular crime.  And I need look at
16   how other courts have treated defendants who've committed
17   similar crimes.
18        When I've considered all those factors, only then will I
19   know what I think a good sentence is.
20        Have you talked about those factors also with Mr. Patton?
21             THE DEFENDANT:  Yes, Your Honor.
22             THE COURT:  Would you let me know if you need a
23   minute at any time?  Mr. Patton, would you offer Mr. Kumar a
24   glass of water please from that carafe.
25                       (Pause in the proceedings.)
```

EXHIBIT 1
Page 13

```
 1          THE COURT:  Mr. Kumar, under some circumstances, you
 2     or the government might have a right to appeal any sentence
 3     that I impose or appeal other aspects of the case, orders that
 4     I might have made or other federal judges might have made.
 5          But in this plea agreement, you're giving up your right to
 6     appeal except that you could claim that your lawyer was not
 7     effective.
 8          Do you understand that?
 9          THE DEFENDANT:  Yes, Your Honor.
10          THE COURT:  And there's also something called
11     "collateral attack."  It's very similar to an appeal.  That
12     just means you go to a different court, you say the federal
13     court made a legal error, injured your rights.  You ask them
14     to set aside some part of your case, the conviction, the
15     sentence, or something else.
16          But with the same exception about claiming that your
17     lawyer was ineffective, you're giving that right up also.
18          Do you understand?
19          THE DEFENDANT:  Yes, Your Honor.
20          THE COURT:  You have many important rights as a
21     criminal defendant in this country.  But if you plead guilty,
22     you're ending the case and so you're giving those right up.
23          I just -- I won't stop after each one, but I want to list
24     these rights so that you're clear on what rights you are
25     giving up.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 14

1    First, you have the right to plead not guilty to any crime

2  charged against you, and you can maintain that plea.  That

3  means you never to have plead guilty if that's not your

4  choice.

5    You have the right to a trial by a jury.  At the trial,

6  you would be presumed to be innocent, and the government would

7  have to prove your guilt beyond a reasonable doubt and would

8  have to convince all the jurors of your guilt 'cause the

9  verdict would have to be unanimous.

10   You have the right to the assistance of a lawyer for your

11  defense, and if you can't afford a lawyer, we'll appoint one

12  for you, not just for the trial but for every other phase of

13  the case.

14   You have the right to see and hear all the witnesses

15  against you and have them cross-examined in your defense.  You

16  have the right to decline to testify.  In other words, you

17  never have to testify, unless that's a choice that you make.

18   And because it's the other side's burden, you don't have

19  to put on any evidence either.  But if you want to put on

20  evidence, you can use the court's subpoena power, and you can

21  make people come in and testify.  You can make them bring

22  documents or other evidence that you think might be helpful.

23   Finally, if you decide not to testify or you decide not

24  put in any evidence, both of which are your right, no one

25  could say anything about that.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

EXHIBIT 1
Page 15

1    For example, the prosecutor can't say to the jury,

2    "Where's Mr. Kumar's evidence" because that would be

3    suggesting to the jury that you have a burden to prove

4    something, which you do not have any burden.

5    Do you understand all the rights I've just described?

6    **THE DEFENDANT:**  Yes, Your Honor.

7    **THE COURT:**  Do you understand that if you plead

8    guilty this morning, you'll be giving up those rights and you

9    will have waived or given up the right to a trial and we won't

10   have a trial.

11   Do you understand that?

12   **THE DEFENDANT:**  Yes, I understand.

13   **THE COURT:**  The information in this case which we

14   talked about a second ago -- that's the charging document --

15   says that in two different tax years, 2009 and 2010, that you

16   underreported the amount of income received by your business,

17   which was called A-Paratransit, Inc.  And the total amount of

18   underreporting in those two years was $2,229,216 for 2009 and

19   $2,412,435 in 2010.

20   So the government charged you with a single count of

21   making and subscribing a false tax return in violation of

22   Title 26, United States Code Section 7206 subpart 1.

23   To get a conviction on that count, the government would

24   have to prove the following three things beyond a reasonable

25   doubt to a jury.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 16

1    Number one, that you signed and filed a U.S. Corporation

2  Income Tax Return, which is call a Form 1120, for the year

3  2010 that you knew contained false information as to a

4  material matter.

5    Number two, that that tax return had a written declaration

6  that it was being signed subject to the penalties of perjury.

7    And number three, that in filing that false corporate tax

8  return, you acted willfully, which essentially means you knew

9  that the return contained false information.

10    Do you understand the government would have to prove those

11  three things?

12        **THE DEFENDANT:**  I understand, Your Honor.

13        **THE COURT:**  And do you understand if you plead guilty

14  this morning, they don't have to prove those three things

15  'cause you're admitting those elements?

16    Do you understand that?

17        **THE DEFENDANT:**  Yes, Your Honor.

18        **THE COURT:**  One other thing that I sometimes forget

19  to mention but I don't want to forget this morning is they're

20  saying that there are two different tax years in which you

21  filed false returns, but they're charging you with one year of

22  2010.

23    As a sentencing judge, I'm permitted to look at and the

24  government is permitted to argue that there was related

25  conduct in 2010, that even though -- excuse me -- 2009, that

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 17

1    even though they didn't charge you with it, I should be able

2    to take that into account in sentencing you.

3        You understand that?

4            **THE DEFENDANT:**  Yes, Your Honor.

5            **THE COURT:**  Mr. Kumar, why are you guilty of this

6    crime?  What did you do that makes you guilty of this crime?

7            **THE DEFENDANT:**  One of the bank account is not

8    showing onto the tax return.

9            **THE COURT:**  I see.  You had a separate bank account

10   that you did not report on your tax return?

11           **THE DEFENDANT:**  Just -- that bank account is opened

12   and, you know, the -- somehow is, you know, just -- you know,

13   the -- is not on that tax return on --

14           **THE COURT:**  Let me tell you why I'm asking the

15   question.  I know what the government thinks you did 'cause

16   they wrote it down.  Part of my job is to make sure -- I don't

17   let anybody plead guilty if they didn't really do the crime

18   and if they don't really think they did the crime.  Some

19   people do the crime but they can't bring themself to admit.

20   Say, well, that's fine; we'll have a trial.

21       So I just want to make sure that there was in fact a

22   violation of Section 7206.  So you opened a bank account.  It

23   wasn't on your -- on your -- that you didn't report on your

24   tax return.  And did you put proceeds from your business into

25   the bank account?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 18

1           **THE DEFENDANT:**  Yes.  Yes, Your Honor.

2           **THE COURT:**  Okay.  And that's the money that didn't

3    show up on your tax returns.

4           **THE DEFENDANT:**  Yes, Your Honor.

5           **THE COURT:**  And did you do the same thing in 2009 and

6    2010?

7           **THE DEFENDANT:**  Yes, Your Honor.

8           **THE COURT:**  And the amounts that I read into the

9    record a second ago, two million and change in one year and

10   two million and change in the other year; were those amounts

11   accurate?

12          **THE DEFENDANT:**  Yes, Your Honor.

13          **THE COURT:**  All right.

14      Mr. Olivera, would you --

15      Oh, and were you the person that signed the Form 1120 for

16   those two tax years?

17          **THE DEFENDANT:**  Yes, Your Honor.

18          **THE COURT:**  Did it say on the tax return that it was

19   being signed subject to the penalty of perjury?  Does it say

20   that on there?

21          **THE DEFENDANT:**  Yes, Your Honor.

22      You were aware that you were not reporting this income

23   that had been put into this other bank account?

24          **THE DEFENDANT:**  Yes, Your Honor.

25          **THE COURT:**  Mr. Olivera, would you please make a

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 19

1   representation concerning the facts the government would be

2   prepared to prove at trial?

3       **MR. OLIVERA:**  Yes, Your Honor.

4       Should this case proceed to trial, the government would be

5   prepared to prove that for 2009 and 2010, Defendant Shiv D.

6   Kumar was the sole shareholder of A-Paratransit, Inc. a

7   corporation engaged in the transportation of disabled and

8   handicapped individuals.

9       For 2009 and 2010, defendant knowingly and willfully file

10  U.S. corporation income tax returns for A-Paratransit, Inc.

11  that were false because they underreported gross receipts that

12  A-Paratransit Inc. received in connection with its business.

13      Defendant diverted more than $2 million in 2009 and again

14  in 2010 to bank accounts that he did not disclose to his

15  account preparing A-Paratransit -- A-Paratransit, Inc.'s U.S.

16  corporation income tax returns.

17      Those amounts were for -- the gross receipts that were

18  deposited into those accounts were used for personal

19  expenditures, including to purchase real property in and

20  around Vallejo, California.

21      **THE COURT:**  Thank you, Mr. Olivera.

22      I don't think I have any more questions for Mr. Kumar.

23      Mr. Olivera, is there anything further you'd like me to

24  ask him or anything you'd like to say for the record?

25      **MR. OLIVERA:**  No, Your Honor.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 20

1     **THE COURT:**  Mr. Patton.

2     **MR. PATTON:**  No, nothing, Your Honor.

3     **THE COURT:**  Do the lawyers agree that the court has

4     satisfied its obligations under Rule 11?

5     **MR. OLIVERA:**  Yes, Your Honor.

6     **MR. PATTON:**  Yes, Your Honor.

7     **THE COURT:**  Mr. Kumar, are you still ready to change

8     your plea?

9     **THE DEFENDANT:**  Your Honor, no, Your Honor.

10     **THE COURT:**  Beg your pardon.

11     **MR. PATTON:**  Yeah.

12     **THE DEFENDANT:**  Yes, Your Honor.  Yes.

13     **THE COURT:**  Okay.  I also like to make sure --

14     **THE DEFENDANT:**  Yes.

15     **THE COURT:**  -- right at the end.

16     Okay.  I'm about to ask you, then, Mr. Kumar, in the

17     matter of the United States of America versus Shiv D. Kumar,

18     Case No. 17CR0014 (sic), to a single violation of Title 26,

19     United States Code Section 7206, subpart 1, and that is the

20     filing of a false tax return, how do you plead?

21     **THE DEFENDANT:**  Guilty, Your Honor.

22     **THE COURT:**  Mr. Kumar, I accept that plea.  I find

23     that you're fully competent and capable of entering an

24     informed plea, that you're aware of the nature of the charges

25     against you and the consequence of your plea, and that your

1    guilty plea is a knowing and voluntary plea supported by an

2    independent basis in fact containing each of the essential

3    elements of the offense.

4         And I therefore accept your plea, and I find you guilty of

5    that crime.

6         As I indicated before, I need to have the Probation Office

7    prepare a written presentence report, so I'll refer this case

8    to the Probation Office.  They're going to prepare a report in

9    draft first before I see it.

10        And the draft will be shared with your lawyer and the

11   government, and if there's anything in there that is

12   incomplete or wrong, you will have an opportunity to object to

13   the Probation Office, and the government will have that right,

14   too.

15        Normally, these objections are worked out informally by

16   the parties.  But if for any reason there's still an objection

17   on the date of your sentencing hearing, I will resolve that

18   objection.

19        The Probation Office will need to speak with you in

20   preparing your report because your background and the

21   circumstances of the crime from your perspective will be very

22   important to them in fashioning a recommendation 'cause they

23   also will recommend a particular sentence.

24        You will need to be prompt and candid and thorough in the

25   information that you give the Probation Office.  And you can

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 22

1   have your lawyer there any time you're talking to Probation if

2   you would like to do that.

3       We'll set a sentencing hearing in just a moment.  I want

4   to tell you that you'll have an opportunity to speak on your

5   own behalf at the sentencing hearing.  You don't have to do

6   that, and you don't have to make that decision now.  You can

7   decide then whether you'd like to address me before I impose

8   sentence.

9       In any crime where there's a victim, the victim also has a

10  right to be heard.  In this case, the victim is the United

11  States government so I have a feeling the prosecutor will

12  undertake that burden at the hearing.

13      You are appearing in front of me out of custody now, so it

14  would be the court's indicated ruling to leave you out of

15  custody pending sentencing.

16      Does anyone want to be heard?

17          MR. OLIVERA:  No objection, Your Honor.

18          MR. PATTON:  Nothing, Your Honor.

19          THE COURT:  That's the court's order.  Mr. Kumar, you

20  will remain out of custody pending sentencing.  You will be

21  subject to the same conditions on presentencing release that

22  you've been subject to as part of your pretrial release.

23              (Pause in the proceedings.)

24          THE COURT:  I would just like to say for the record

25  that the case number that I should have read before, that

1    apparently I read incorrectly, is 17CR00114.  I suspect maybe

2    I said two 4's and -- anyway.  It doesn't matter what it was.

3        That's the correct case number.

4        Have the parties discussed an appropriate sentencing date?

5            **MR. OLIVERA:**  We have, Your Honor.  We have, Your

6    Honor.

7        We've discussed it with Mr. Noble as well.  July 7th would

8    work for -- for all parties.

9            **THE COURT:**  Very good.  The court will set this

10   matter for sentencing on July 7, 2016 (sic) at 9:30 a.m.

11       Mr. Kumar, I don't have a regular courtroom or chambers

12   here, so you'll want to get here a little early just so you

13   can make sure that you can figure out where I am because it

14   will be in one of the court rooms in this building but I'm not

15   sure which one.

16       If Mr. Patton intends or Mr. Cannon intends to ask for a

17   later voluntary surrender date, I would just ask you that meet

18   and confer with the government before everybody gets to the

19   microphone so that that can be -- I can know where everybody

20   stands on that issue.

21               (Off-the-record discussion.)

22           **THE COURT:**  I think I need to change my brand of

23   coffee.  Apparently, I set your sentencing hearing last year.

24       The sentencing hearing will occur on July 7, 2017 at 9:30

25   a.m.  I think the parties understood that, but we need to have

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

EXHIBIT 1
Page 24

1  a clear transcript.

2      Other matters for the record?

3          **MR. OLIVERA:**  No, Your Honor.

4          **MR. PATTON:**  No, Your Honor.  Thank you.

5          **THE COURT:**  All right.  Thank you.  We'll see you in

6  July.

7          **MR. OLIVERA:**  Thank you, Your Honor.

8          (Proceedings were concluded at 10:08 A.M.)

9                          --o0o--

10

11                  <u>**CERTIFICATE OF REPORTER**</u>

12

13          I certify that the foregoing is a correct transcript

14  from the record of proceedings in the above-entitled matter.

15  I further certify that I am neither counsel for, related to,

16  nor employed by any of the parties to the action in which this

17  hearing was taken, and further that I am not financially nor

18  otherwise interested in the outcome of the action.

19

20  _____

21      Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

22              Friday, October 20, 2017

23

24

25

***RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530***

EXHIBIT 1
Page 25

EXHIBIT 2

1     UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA

3     Before The Honorable Jon S. Tigar, District Judge

4

5   UNITED STATES OF AMERICA,       )
                                    )
6           Plaintiff,              )
                                    )
7   vs.                             )   No. CR 17-00114-JST-1
                                    )
8   SHIV D. KUMAR,                  )
                                    )
9           Defendant.              )
    _____)

10
                                    San Francisco, California
11                                  Friday, October 6, 2017

12
     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
13            RECORDING 11:56 - 12:24 = 28 MINUTES

14   APPEARANCES:

15   For Plaintiff:
                                    United States Attorney's
16                                    Office
                                    Northern District of
17                                    California
                                    1301 Clay Street, Suite 340S
18                                  Oakland, California 94612
                              BY:   JOSE A. OLIVERA, ESQ.
19
     For Defendant:
20                                  Sugarman & Cannon
                                    737 Tehama Street, Unit 3
21                                  San Francisco, California
                                      94103
22                            BY:   CHRISTOPHER J. CANNON, ESQ.

23   Transcribed by:                Echo Reporting, Inc.
                                    Contracted Court Reporter/
24                                  Transcriber
                                    echoreporting@yahoo.com
25

1 <u>Friday, October 6, 2017</u>                           <u>11:56 a.m.</u>

2                         P-R-O-C-E-E-D-I-N-G-S

3                              --oOo--

4            THE CLERK:  Calling criminal case 17-114, United

5 States of America versus Shiv D. Kumar.

6        Counsel, will you please make your appearances.

7            MR. OLIVERA:  Good morning again, your Honor.

8 Jose Olivera for the United States.

9            MR. CANNON:  Good morning, your Honor.

10 Christopher Cannon on behalf of Shiv Kumar who is present.

11           MS. GOLDSBERRY:  Good morning, your Honor.

12 Jessica Goldsberry for the Probation Office.

13           THE COURT:  Good morning to all of you.  Good

14 morning, Mr. Kumar.

15       Before we proceed any further, I expected based on the

16 (indiscernible) filed before the hearing -- and it appears

17 to be true based on my just looking out into the gallery

18 that there are many people here on Mr. Kumar's behalf.

19       Mr. Cannon, do you want to identify any of those people

20 for the record?

21           MR. CANNON:  Your Honor, it's Mr. Kumar's

22 immediate family, all of whom are mentioned in the probation

23 report.  If you could all stand up, please.  And -- and

24 friends of the family.

25           THE COURT:  Okay.  Thank you.

1   Well, you heard me say this before, but I think it
2 bears repeating.  It's hard to go through a criminal case
3 for anybody, and, as I said before, sometimes the sentence
4 is higher than what we thought it was going to be.
5 Sometimes it's lower than what they thought it was going to
6 be, and so hearings sometimes are difficult for people who
7 are in attendance, but as hard as a criminal case can be on
8 the Defendant, it's always easier if that person has the
9 support of family and friends, and so I appreciate your
10 being here also.  This building belongs to you because it's
11 -- it was built by the taxpayers, so welcome.
12   I have read all the materials that were submitted in
13 advance of this hearing, including the pre-sentence report,
14 the sentencing memorandum submitted by the parties, the
15 numerous letters submitted on Mr. Kumar's behalf.
16   Are there any objections to the pre-sentence
17 investigation report?
18       MR. CANNON:  Just a correction to the tax loss,
19 your Honor, the Government submitted a memo on, and it -- it
20 lowers the tax loss by about $40,000, but, other than that,
21 no objection.
22       THE COURT:  I did read that memorandum, and I only
23 keep the round numbers in my head.  So -- but I read that
24 memorandum, and I -- does the pre-sentence report need to
25 actually be amended to reflect the new tax loss?  Is there a

 1 reason to do that, to make that order?

 2          MR. CANNON:  I don't think it's really necessary,

 3 your Honor, because the guidelines don't really change.

 4 What happened was the --

 5          THE COURT:  Oh, right.

 6          MR. CANNON:  The details don't really make a

 7 difference.

 8          THE COURT:  I think also -- I think for sentencing

 9 purposes it doesn't matter.

10      So, Ms. Goldsberry?

11          MS. GOLDSBERRY:  Your Honor, I can make the change

12 or address the change in the Statement of Reasons.

13          THE COURT:  Oh, very good.  Okay.  So then at

14 least it's part of the BOP --

15          MS. GOLDSBERRY:  Exactly.

16          THE COURT:  -- paperwork.

17          MS. GOLDSBERRY:  Exactly.  It will be reflected.

18          THE COURT:  Very good.  Okay.  Putting that to one

19 side, are there any other objections to the pre-sentence

20 investigation report?

21          MR. CANNON:  Not from the Government, your Honor.

22          MR. OLIVERA:  No, your Honor.

23          THE COURT:  The Court adopts the pre-sentence

24 investigation report, the factual findings contained in it,

25 and the sentencing guideline calculations which the parties

1 all agree on.

2          Ms. Goldsberry, do you have anything you want to

3 add to the pre-sentence investigation report?

4          MS. GOLDSBERRY:  No, your Honor.

5          THE COURT:  Does anybody who's at a microphone now

6 anticipate that anyone who's not at a microphone will

7 address the Court?

8          MR. OLIVERA:  No, your Honor.

9          MR. CANNON:  No, your Honor.

10          THE COURT:  Okay.  So I'm going to proceed as I

11 normally would.  I'll hear from the Government in support of

12 its sentencing recommendation.  I'll hear from Mr. Cannon in

13 support of the Defendant's sentencing recommendation.  And

14 then, Mr. Kumar, I'll give you a chance to speak if you'd

15 like to be heard.

16          Mr. Olivera?

17          MR. OLIVERA:  Thank you, your Honor.  So, your

18 Honor, I'd just like to make two points with regard to the

19 variance issue, but before I do that, I just would like the

20 Court to know that in October, late October of 2016, Mr.

21 Kumar, through his attorneys came forward and said he wanted

22 to plead guilty to the crimes in this case, and that is

23 something unusual, at least in my experience, your Honor.

24 That doesn't always happen, and I commend him for doing

25 that, and I would say that, although the Government's

1  position is that 30 months is appropriate, that he wouldn't

2  -- it would not be unreasonable for the Court to find that a

3  variance, given that and what Mr. Kumar has said regarding,

4  you know, his personal background, somewhat of a variance is

5  -- may be appropriate and reasonable.  However, a 30-month

6  variance, your Honor, is just -- is not appropriate in this

7  case for a few reasons, and this is why I would just address

8  two points.

9      The nature and circumstances of this case.  Mr. Kumar

10  is a millionaire.  He's very wealthy.  And for approximately

11  three years he defrauded the Government of over $1.5

12  million.  The only reason Mr. Kumar came forward is because

13  the IRS initiated an audit, and when they initiated the

14  audit, Mr. Kumar filed amended tax returns to report

15  additional gross income, and in doing so, he still didn't

16  report the correct liability that he owed.  However, it was

17  substantially less than what the Government originally

18  believed based on the Defendant's arguments.

19      One point five million dollars, your Honor, is a lot of

20  money, and a probationary sentence just doesn't reflect the

21  seriousness of the crime he committed there.

22      With regard to the second point, deterrence, your

23  Honor, as the Court is well aware, you know, taxes are the

24  lifeblood of the country, and they are dependent on people

25  voluntarily reporting accurately the taxes that they owe,

1  and Mr. Kumar simply didn't do that here, and the public

2  needs to see some sort of punishment for someone who -- who

3  cheated the Government out of $1.5 million or at least

4  intended to.  That is -- you know, someone who makes

5  $100,000 a year, that would take them 15 years to make, and

6  Mr. Kumar did that in a matter of three years.

7        So, with that, your Honor, I believe a sentence here of

8  at the very least some incarceration is appropriate, and the

9  Government again just submits on the papers.

10            THE COURT:  Thank you, Mr. Olivera.

11       Mr. Cannon?

12            MR. CANNON:  Your Honor, I respectfully disagree

13 with Mr. Olivera, but I would thank him for acknowledging

14 that Mr. Kumar did, in fact, offer to plead guilty

15 immediately, and who knows what was in Mr. Kumar's mind in

16 2007.  In 2007, he was -- his wife was dying, was dying of

17 cancer, and that's when this behavior began and continued in

18 2007, 2008, and 2009.  But it stop -- it stops after that,

19 and I think two things are significant.

20       Mr. Olivera was talking about punishment.  Mr. Kumar,

21 in fact, has been punished.  He's paid in two separate ways.

22 One, he's paid a very substantial financial cost because, as

23 everybody agrees, he amended his returns.  He paid the taxes

24 that he's going to be -- that were due, and there is a

25 penalty of 75 percent of the tax -- of the tax that was

1    evaded.  So he's going to be paying more than $1,000,000 in

2    penalties on top of the taxes that he's already paid.

3         And when you look at Mr. Kumar's life, Mr. Kumar is --

4    literally has an up from the bootstrap story.  I mean, he

5    came to this country and started, you know, working sewing

6    buttons on shirts.  He then leased a gas station.  He then

7    started a taxi company, and he now is employed by his

8    children in that same taxi company.  And I think it's really

9    significant that his children have put in compliance

10   programs to make sure that nothing like this is going to

11   happen again.  And when you look at the deterrent effect,

12   the -- when the -- when the Justice Department released its

13   press release indicating that Mr. Kumar was being

14   prosecuted, that had a huge effect in the Indian community.

15   Mr. Kumar has talked about that.  Some of the letter writers

16   have talked about that.  He's been devastated by this

17   prosecution.  He's taking this so seriously that on August

18   23rd of this year, he suffered a heart attack, and he's

19   still getting treatment for the results of that heart

20   attack.  This is not someone who's simply writing a check

21   and making these problems go away.  This is someone who's

22   worked his entire life, who's had a really good reputation,

23   and for a three-year period was, in fact, cheating on his

24   taxes.  He understands that he did that, but he's more than

25   paid the price for what he did seven years -- you know,

1 almost eight or nine years ago.  He simply has paid the

2 price.  The community understands there's a price to be paid

3 for evading taxes, and sending him to prison won't

4 accomplish anything.  If -- I think this is a -- he's not a

5 threat.  He's not a danger.  Sending him to prison just

6 won't do anything, and I think for someone of his age and

7 his record, probation is the appropriate sentence in this

8 case.

9           THE COURT:  Thank you, Mr. Cannon.

10      Mr. Kumar, would you like to address me?

11           THE DEFENDANT:  Yeah.  I came to America in 1981,

12 and American people give me good opportunity to live here,

13 and what happened with the tax I'm really sorry it happened.

14 I lost my respect from my community, my family, shame.  I

15 won't happen anymore.  I'm sorry.  Thank you.

16           THE COURT:  Thank you, Mr. Kumar.

17      Is the matter submitted?

18           MR. OLIVERA:  Yes, your Honor.

19           MR. CANNON:  Yes, your Honor.

20           THE COURT:  Let me just start by making certain

21 findings.  The total offense level on this case is 19.  The

22 guideline sentencing range for this offense is between 30

23 and 37 months.

24      Now, because you're at the end of the calendar, the

25 people in the audience, including Mr. Kumar, who's out of

1   custody, have heard me say this before, but I'll repeat it.

2   Sentencing is the hardest thing that I do, and the reason --

3   or one of the reasons it's the hardest thing is because

4   nobody is only one thing, and because there are so many

5   different considerations that the Court has to take into

6   account.  How serious was the crime?  How much do we care

7   about the crime in the society?  What is the message that

8   the sentence sends?  Will anybody hear the message?  Would

9   the Defendant have stopped on his own or did he stop only

10  because he got caught?  How are we treating other people who

11  have committed this crime?  How are we treating other people

12  who have committed crimes in general?  What weight do we

13  give somebody's upbringing?  To what extent do we think that

14  the Defendant had the opportunity to lead a law abiding

15  life?  How easy or hard is it for somebody to do that?

16  These are all questions that don't have mathematical

17  answers.

18       Mr. Kumar was the president and shareholder of a multi-

19  million-dollar business.  I think it would be fair to say

20  that he's a very wealthy person.  He -- I'll say more about

21  this in a second.  For the most part, he came by that wealth

22  very honestly.

23       Before I get to that, let me just say the crime in this

24  case was very large.  This was a very large crime.  Mr.

25  Kumar stole a million and a half dollars.  People don't use

the verb "steal" when they talk about tax fraud.  I think in
this country we have an ambivalent relationship to taxation.
We don't like to think of it as a theft.  It is a theft, and
it was the theft of a million and a half dollars, and it
wasn't accidental or inadvertent.  Certain things had to be
done with a great deal of intention to conceal that much
income from the IRS.  Bank accounts had to be concealed by
Mr. Kumar's accountant.  Employees had to be instructed to
conceal payment records from the bookkeeping records of the
company.  And the only reason Mr. Kumar stopped this conduct
is that he was caught.

There's a lot of good that can be said about Mr. Kumar.
I think all of you who wrote letters to me -- I stayed up
late last night reading them, and I got in to work extra
early so I could make sure that I could finish.  In many
ways Mr. Kumar exemplifies the best of the immigrant work
ethic that has defined this country and built this country.
I just spoke at a naturalization ceremony at the Paramount
Theater two weeks ago to 1300 brand new citizens, one of the
greatest things I ever did.  A lot is said about immigrants
right now in this country.  We're in the middle of a big
debate.  So I want to be very clear.  Immigrants are great,
and Mr. Kumar exemplifies the very best of what we hope
immigrants will bring when they come to our country.  We
have an expression here that someone has a rags to riches

1 story.  Mr. Kumar really did.  He's a very -- he has started
2 many successful businesses.  He's a tireless worker.  More
3 than one of you in your letters talked about that.  Mr.
4 Kumar goes to work.  That's what he does.  And so his
5 wealth, for the most part, represents the fruits of his --
6 of his efforts.  He's justifiably proud of his success.  I
7 think for the most part he's been a great example to his
8 family, and he is certainly a loving family member.

9      But this crime is essentially inexcusable.  Mr. Kumar
10 had every advantage.  He didn't need the money.  He just
11 stole it.  He used it to acquire real estate, and some of
12 what permeates the papers in this case is the lack of
13 recognition, but that's what happened.  Tax fraud is
14 stealing.  The United States government is not an
15 abstraction.  It's us.  It's everyone else.  So when you
16 commit tax fraud, you steal from everybody else in the
17 community.  Tax fraud is stating that you don't need to do
18 your part and you think other people in the country should
19 pay your share.

20      I won't go on with this, the benefits at length, but I
21 emphatically reject the idea contained in the Defendant's
22 sentencing memorandum and the letters of support attached to
23 it that Indian attitudes about tax compliance played a part
24 in this crime and that this Court should take that into
25 account.  I reject that idea for two reasons.  First, it's

irrelevant.  I cannot imagine as a sentencing judge giving
someone a lower sentence because they came from a country in
which compliance was important law is less important.  I
don't even know how I would construct that sentence.
Secondly, Mr. Kumar had been here a very long time, and I
would hope that I could at least assume that until this
crime was committed he faithfully complied with the United
States tax laws.

So even if I were able, if I felt able to give that
idea some consideration, I would like to think that Mr.
Kumar's case (12:13:44).

I agree that the guideline sentence in this case is
somewhat on the high side for a Defendant of Mr. Kumar's age
and for somebody with no prior criminal history.  I do not
think I can not impose a custodial sentence on someone who
stole a million and a half dollars on day when I have just
finished sending some of society's poorest citizens to
prison for lengthy stretches of time, many years in custody,
defendants with many fewer options than this Defendant has.
Basic fairness and accountability make probation
inappropriate.

As the table included in the Government's memorandum
shows, a custodial sentence would also be consistent with
the way other tax fraud cases have been handled.  I think
it's worth noting that this case has a greater tax loss than

1 any of the many cases on the Government's table.

2     I have reviewed the statistical information submitted

3 by Mr. Cannon.  I thank both of you for doing that.  I've

4 been saying for five years that I wish people would do it,

5 and I read it carefully.  I thought the information

6 submitted for the Defendant was also helpful.  It doesn't

7 tell me anything about the size of the tax loss in those

8 cases, and it doesn't tell me about the personal

9 circumstances of the Defendants.  The two sentences from the

10 Ninth Circuit also indicate that a custodial sentence would

11 be appropriate in this case.

12     And, finally now, from the letters attached to the

13 Defendant's memorandum that the sentence in this case would

14 have a general deterrence consequence, which is something I

15 often wonder about, but in this case I don't have any doubt

16 we know that the community at large wonders what the penalty

17 for this kind of crime is, and a no custody sentence says if

18 you have the funds to pay a fine, you're going to be okay or

19 maybe you won't get caught, and that is not a result that

20 I'm prepared to cause.

21     So, for all those reasons, I'm going to vary downward

22 and impose a sentence of 18 months.

23     Mr. Kumar, pursuant to the Sentencing Reform Act of

24 1984, it is my judgment that you are hereby committed to the

25 custody of the Bureau of Prisons to be imprisoned for a term

of 18 months.  Upon release from imprisonment, you shall be placed on supervised release for a term of three years. Within 72 hours of release from custody of the Bureau of Prisons, you shall report in person to a probation office in the district to which you are released.

While you are on supervised release, you shall not commit any federal, state, or local crime.  You shall comply with the standard conditions that have been adopted by this Court.  You shall refrain from the unlawful use of a controlled substance and submit to a drug test within 15 days of release from supervised release and to periodic drug tests thereafter, and you shall comply with the following additional conditions.

Number one, you shall pay any restitution, fine, or special assessment as imposed by this judgment that remains unpaid at the commencement of your term of your supervised release.  You shall comply and cooperate with the Internal Revenue Service in a good faith effort to pay any outstanding tax liability that remains at the commencement of supervised release, including any assessed penalty and interest.

You shall timely and accurately file all future income tax returns required by law during the term of supervision unless an extension of time is granted by the IRS.  You shall not open any new lines of credit or incur new debt

1  without the prior permission of your probation officer.  You

2  shall provide your probation officer with access to any

3  financial information, including tax returns, and you shall

4  authorize the probation officer to conduct credit checks and

5  retain copies of income tax returns.

6      You shall cooperate in the collection of DNA as

7  directed by your probation officer.  You shall not own or

8  possess any firearms, ammunition, destructive devices or

9  other dangerous weapons.

10      I'll advise you that the crime to which you pled guilty

11  is a felony and even after the expiration of your term of

12  supervised release in every jurisdiction in the United

13  States, it itself would be the felony for you to possess a

14  firearm or dangerous or destructive device.

15      You will be subject to a search clause.  You shall

16  submit your person, residence, office, vehicle, electronic

17  devices and your data, including cell phones, computers, and

18  electronic storage media or any property under your control

19  to a search.  Such a search shall be conducted by the United

20  States Probation Office or any federal, state, or local law

21  enforcement officer at any time of the day or night, with or

22  without probable cause or suspicion.  Failure to submit to a

23  search by itself can be grounds for revocation of your

24  supervised release, and you have to warn any residents that

25  the premises might be subject to a search.

*Echo Reporting, Inc.*

EXHIBIT 2
Page 41

1    You are to pay the United States a special assessment

2 of $100.  Instructions about how to pay that will be

3 contained in your paperwork.

4    I know that the Probation Office has recommended that

5 you pay a fine in the amount of $15,000, but I'm waiving the

6 fine in this case.  I think in light of the penalties

7 imposed by the Internal Revenue Service, a fine of some kind

8 would be both unnecessary and will also create an accounting

9 issue for you and for the Probation Office that's not worth

10 a candle.  Any fine in this case is waived, the purpose of a

11 fine having been accomplished by the penalty provisions of

12 the Internal Revenue Service.

13    I also order you to pay restitution to the Internal

14 Revenue Service in an amount to be determined.  While you

15 are in prison, that money can be paid --

16        MR. CANNON:  Your Honor, could we have a break for

17 a minute?

18        THE COURT:  Yes, yes.  Should we get an EMT in

19 here?

20    (Pause.)

21        MR. CANNON:  It could not hurt.

22        THE COURT:  We're going to -- folks, the Court's

23 going to be in recess.  Somebody call 911 for me.

24    (Proceedings recessed briefly.)

25        MR. CANNON:  Your Honor, I realize the proceedings

1   is almost over but it's not completely over.  Given Mr.

2   Kumar's condition, if we could just continue -- continue

3   this to finalize the --

4           THE COURT:  I didn't want to interrupt you while

5   you were attending to Mr. Kumar, but that was going to be my

6   suggestion.  And let me also say that, first of all, we're

7   back on the record.  There is an electronic record being

8   made of these proceedings.

9       We're back on the record just for the purpose of making

10  or continuing the proceedings and also asking counsel to

11  have a conversation about a surrender date.  Obviously Mr.

12  Kumar is a good candidate for voluntary surrender, and it

13  would be the Court's inclination to set a surrender date in

14  the future.  If the parties could work that out, that would

15  be good.  I also would like to set the matter over for

16  enough time that I have some information, if there is any,

17  medical information about today's event, and, Mr. Newel

18  (phonetic), can we -- it's a little further away than I'd

19  like, but I think we're looking at November 17.  We can also

20  maybe specially set it.

21          THE CLERK:  Yes.

22          THE COURT:  Are counsel available on November

23  17th?

24          MR. OLIVERA:  Yes, your Honor.

25          THE COURT:  Mr. Cannon?

1    MR. CANNON:  I'm just looking very quickly, your

2  Honor.

3    MR. OLIVERA:  While he's doing that, your Honor,

4  just with regard to restitution, would you like the parties

5  just to submit a stipulation with regard to restitution?

6    THE COURT:  If it's possible to reach a

7  stipulation, that would be good, and the pre-sentence report

8  anticipates that the matter will be resolved further.  If

9  the parties can tie up that loose end, that would be

10  helpful.  If not, then they should be prepared to tell me

11  what further proceedings will be necessary to get them a

12  number.

13    MR. CANNON:  We'll be able to do that.  November

14  17th is fine.

15    THE COURT:  Okay.  Very good.  I'm going to order

16  -- I'm going to continue this matter -- I'm going to

17  continue the sentencing hearing until November 17 at 9:30

18  a.m. and order Mr. Kumar to be personally present.  These --

19  I've already made the requests of counsel I need to make,

20  and so any further proceedings in the criminal case are

21  over, and the Court is in recess.

22    (Proceedings concluded at 12:24 p.m.)

23

24

25

1        <u>CERTIFICATE OF TRANSCRIBER</u>

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14  

15

16           Echo Reporting, Inc., Transcriber

17             Thursday, October 12, 2017

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

EXHIBIT 2
Page 45

EXHIBIT 3

1  BRIAN J. STRETCH (CABN 163973)
   United States Attorney
2
3  BARBARA J. VALLIERE (DCBN 439353)
   Chief, Criminal Division
4
5  JOSE APOLINAR OLIVERA (CABN 279741)
   Assistant United States Attorney
6
7  REBECCA SABLE (DCBN 1002749)
   U.S. Department of Justice
   Trial Attorney
8
9      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
10     Telephone: (415) 436-6888
       FAX: (415) 436-7009
11     E-mail: jose.olivera@usdoj.gov

12  Attorneys for United States of America

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15                   OAKLAND DIVISION

16  UNITED STATES OF AMERICA,        )   NO. CR  4:17-CR-00114-JST-1
                                     )
17              Plaintiff,           )   PLEA AGREEMENT
                                     )
18      v.                           )
                                     )
19  SHIV D. KUMAR,                   )
                                     )
20              Defendant.           )
                                     )
21  _____)

22      I, SHIV D. KUMAR, and the United States Attorney's Office for the Northern District of

23  California (hereafter "the government") enter into this written Plea Agreement (the "Agreement")

24  pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

25  The Defendant's Promises

26      1.    I agree to plead guilty to Count 1 of the captioned Information charging me with

27  making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1). I agree that the elements

28  of the offense are as follows: (1) I signed and filed a Form 1120, U.S. Corporation Income Tax Return,

PLEA AGREEMENT                          1

EXHIBIT 3
Page 46

FILED

MAR 24 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

for the year 2010 that I knew contained false information as to a material matter; (2) the corporate tax
return contained a written declaration that it was being signed subject to the penalties of perjury; and (3)
in filing the false corporate tax return, I acted willfully.

I agree that the maximum penalties are as follows:

| | | |
|---|---|---|
| a. | Maximum prison term: | 3 years |
| b. | Maximum fine: | $250,000 fine, or twice the gain or loss from the offense, whichever is greater |
| c. | Maximum supervised release term | 1 year |
| d. | Mandatory special assessment: | $100 per count |
| e. | Potential Deportation | |

I acknowledge that pleading guilty may have consequences with respect to my immigration status if I am not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which I am pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and I understand that no one, including my attorney or the district court, can predict to a certainty the effect of this conviction on my immigration status. I nevertheless affirm that I want to plead guilty regardless of any immigration consequences that may result from my guilty plea, even if the consequence is my automatic removal from the United States.

2.      I agree that I am guilty of the offense to which I am pleading guilty, and I agree that the following facts are true:

a.      I am 60 years old and at all relevant times was a resident of Dublin, California.

b.      Throughout calendar years 2009 through 2010, I was the sole shareholder and president of A-Paratransit, Inc. ("API"), a corporation engaged in the transportation of disabled and handicapped individuals. API conducted business in Alameda County.

c.      For 2009 and 2010, I knowingly and intentionally made, subscribed, and filed with the Internal Revenue Service API's Forms 1120, U.S. Corporation Income Tax Returns, that were false as to a material matter and that I knew were not true and correct. These tax returns were false because they did not report all of API's gross receipts. Each of these tax returns contained a written

PLEA AGREEMENT                                        2

EXHIBIT 3
Page 47

1   declaration, signed by me, stating that the tax return was being signed subject to the penalties of perjury.

2   At the time that I made and signed each of those tax returns under penalties of perjury, I knew that each

3   tax return was not true, correct, or complete and that each was in fact a false and fraudulent tax return.

4           d.      For 2009 and 2010, I deposited, or caused to be deposited, API's gross receipts

5   into bank accounts at Bank of America (bank account number x2454), Bank of the West (bank account

6   number x0608), and U.S. Bank (bank account number x7181). Each bank account was held in the name

7   of A-Paratransit Corporation and I controlled each of those bank accounts.

8           e.      On API's Forms 1120 for 2009 and 2010, I knowingly and willfully underreported

9   gross receipts received by API in the amounts of $2,229,216 and $2,412,435, respectively. I caused

10   those gross receipts to be deposited into bank account x0608 and bank account x7181. I did not disclose

11   those two bank accounts to API's accountant prior to filing API's 2009 and 2010 original tax returns and

12   did not report those gross receipts to the IRS. Instead, the unreported gross receipts were distributed to

13   Dublin Investment Group, Inc., and San Ramon Investments, Inc. I caused the unreported gross receipts

14   to be used for my family's use, including to purchase real property in and around Vallejo, California.

15           f.      To conceal the true gross receipts received by API, I supplied API's accountant

16   who prepared API's 2009 and 2010 corporate tax returns with only those records from API's business

17   bank account x2454. I knowingly and willfully did not provide him with the bank account records from

18   bank accounts x7181 or x0608. Moreover, I altered, or caused to be altered, API's accounting records

19   that I provided to API's accountant for 2009 and 2010 by omitting the gross receipts I had diverted to

20   the undisclosed bank accounts. I knowingly and intentionally did not provide my accountant with

21   complete and accurate information regarding the actual amount of gross receipts received by API.

22           g.      The underreporting of A-Paratransit's gross receipts for 2009 and 2010 resulted in

23   a tax loss to the United States of $1,584,055.

24       3.     I agree to give up all rights that I would have if I chose to proceed to trial, including the

25   rights to a jury trial with the assistance of an attorney; to confront and cross-examine government

26   witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth

27   Amendment claims; to any further discovery from the government; and to pursue any affirmative

28   defenses and present evidence.

1    4.    I agree to give up my right to appeal my conviction, the judgment, and orders of the

2   Court, as well as any aspect of my sentence, including any orders relating to forfeiture and/or restitution,

3   except that I reserve my right to claim that my counsel was ineffective.

4    5.    I agree not to file any collateral attack on my conviction or sentence, including a petition

5   under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, except that I reserve my right to claim that my counsel was

6   ineffective.  I also agree not to seek relief under 18 U.S.C. § 3582.

7    6.    I agree not to ask the Court to withdraw my guilty plea at any time after it is entered.  I

8   understand that by entering into this Agreement: (a) I agree that the facts set forth in Paragraph 2 of this

9   Agreement shall be admissible against me under Fed. R. Evid. 801(d)(2)(A) in any subsequent

10   proceeding, including at trial, in the event I violate any of the terms of this Agreement, and (b) I

11   expressly waive any and all rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 with regard to the

12   facts set forth in Paragraph 2 of this Agreement in such subsequent proceeding.  I understand that the

13   government will not preserve any physical evidence obtained in this case.

14    7.    I understand that the Court must consult the United States Sentencing Guidelines and

15   take them into account when sentencing, together with the factors set forth in 18 U.S.C. § 3553(a).  I

16   also understand that the Court is not bound by the Guidelines calculations below; the Court may

17   conclude that a higher Guidelines range applies to me, and, if it does, I will not be entitled, nor will I ask

18   to withdraw my guilty plea.  I further agree that regardless of the sentence that the Court imposes on me,

19   I will not be entitled, nor will I ask, to withdraw my guilty plea.  I agree that the Sentencing Guidelines

20   offense level should be calculated as set forth below, and that I will not request a downward departure

21   under the Sentencing Guidelines from that offense level although I reserve the right to seek a downward

22   variance based on the factors set forth in 18 U.S.C. § 3553(a). I understand that the government is free to

23   oppose any such request. The parties have reached no agreement regarding my Criminal History

24   Category.

25    a.    Base Offense Level, U.S.S.G. §§ 2T1.1 & 2T4.1(I):                  22

26    b.    Tax Loss:                                                          $1,584,055

27    c.    Acceptance of Responsibility:                                      - 3

28          If I meet the requirements of U.S.S.G. § 3E1.1, I may be entitled to a three-

PLEA AGREEMENT                                          4

EXHIBIT 3
Page 49

1  level reduction for acceptance of responsibility, provided that I forthrightly
admit my guilt, cooperate with the Court and the Probation Office in any
2  presentence investigation ordered by the Court, and continue to manifest an
acceptance of responsibility through and including the time of sentencing.
3

4      d.    Adjusted Offense Level:                                     19

5      8.    I agree that regardless of any other provision of this Agreement, the government may and

6  will provide the Court and the Probation Office with all information relevant to the charged offense and

7  the sentencing decision. I agree that, based on the nature of the offense the Court should impose the

8  following special condition of supervised release which is reasonably related to deterrence and

9  rehabilitation:

10      <u>Special Condition (Searches)</u>

11  The defendant shall submit his person, residence, office, vehicle, electronic devices and their
data (including cell phones, computers, and electronic storage media), and any property under
12  defendant's control to a search. Such a search shall be conducted by a United States Probation
Officer or any federal, state, or local law enforcement officer at any time, with or without
13  suspicion. Failure to submit to such a search may be grounds for revocation; the defendant shall
warn any residents that the premises may be subject to searches.
14

15      9.    I agree that I will make a good-faith effort to pay any fine, forfeiture, or restitution I am

16  ordered to pay. I agree to pay the special assessment at the time of sentencing.

17      I agree to pay full restitution for all losses caused by all the schemes or offenses with which I

18  was charged in this case, and I understand that the amount of restitution will not be limited to the loss

19  attributable to the count to which I am pleading guilty, pursuant to 18 U.S.C. § 3663(a)(3). I understand

20  that the Court will not consider my economic circumstances in determining the restitution amount. I

21  agree to pay restitution to the Internal Revenue Service in an amount to be set by the Court at the time of

22  sentencing, but in no event less than $1,584,055.

23      The parties agree that I shall be credited $1,324,000 against the restitution award as an offset in

24  order to reflect the payments previously made to the Internal Revenue Service. The $1,324,000

25  previously paid to the Internal Revenue Service will be credited to restitution as follows:

26  //

27  //

28  //

PLEA AGREEMENT                     5

EXHIBIT 3
Page 50

| Tax Years | Amount to be Credited to Tax |
|-----------|------------------------------|
| 2009      | $684,653                     |
| 2010      | $639,347                     |
| Totals:   | $1,324,000                   |

After accounting for the offset, I agree to pay no less than the remaining amount of $260,055 in restitution as follows:

| Tax Years | Amount to be Credited to Tax |
|-----------|------------------------------|
| 2009      | $78,923.80                   |
| 2010      | $181,121.22                  |
| Totals:   | $260,055                     |

Any restitution payments shall be paid through the Office of the Clerk of the District Court by bank or cashier's check or money order made payable to the "Clerk, United States District Court." Further, the restitution described above shall be paid to or on behalf of the following victim: Internal Revenue Service.

I understand that the restitution described above creates a lien in favor of the United States on all property and rights to property I may possess upon entry of judgment and continues for 20 years or until the debt is paid in full. I further understand the government will record a notice of the lien in any county where I reside or have property. I further understand that this order of restitution cannot be discharged in bankruptcy and that if I default on the payment of a fine or restitution, the Court may revoke probation or a term of supervised release, modify the terms or conditions of probation or supervised release, resentence me, hold me in contempt of court, order the sale of property, enter or adjust a payment schedule, or take any other action necessary to obtain compliance.

Within thirty days of the execution of this Plea Agreement, I agree to complete, under penalty of perjury, a financial statement provided by the U.S. Attorney's Office and to update that statement with

EXHIBIT 3
Page 51

1 material changes within seven days of the change. I understand that I must identify all assets and

2 financial interests valued at more than $1,000. I further understand that these assets and financial

3 interests include all assets and financial interests in which I have an interest, direct or indirect, whether

4 held in my own name or in the name of another, in any property, real or personal.

5        I agree to surrender assets I obtained as a result of my crimes, and release funds and property

6 under my control in order to pay any fine, forfeiture, or restitution. I further agree to notify the Financial

7 Litigation Unit, United States Attorney's Office ("FLU") before transferring any interest in property

8 owned directly or indirectly by me, including any interest held or owned under any other name or entity,

9 including trusts, partnerships, and/or corporations. I also agree to notify the FLU of any interest in

10 property I may obtain, directly or indirectly, including any interest obtained under any other name, or

11 entity, including a trust, partnership, or corporation, after the execution of this Plea Agreement until the

12 fine or restitution is paid in full.

13        I agree that any fine, forfeiture, or restitution imposed by the Court against me will be due

14 immediately and subject to immediate enforcement by the government as authorized by 18 U.S.C. §

15 3613. I further understand that the government may seek immediate collection of the entire fine,

16 forfeiture, or restitution from any assets without regard to any schedule of payments imposed by the

17 Court or established by the Probation Office and that monetary penalties imposed by the Court will be

18 submitted to the Treasury Offset Program so that any federal payment or transfer of returned property I

19 receive may be offset and applied to federal debts.

20        10.    I agree not to commit or attempt to commit any crimes before sentence is imposed or

21 before I surrender to serve my sentence. I also agree not to violate the terms of my pretrial release; not

22 to intentionally provide false information to the Court, the Probation Office, Pretrial Services, or the

23 government; and not to fail to comply with any of the other promises I have made in this Agreement. I

24 agree that if I fail to comply with any promises I have made in this Agreement, then the government will

25 be released from all of its promises in this Agreement, including those set forth in the Government's

26 Promises Section below, but I will not be released from my guilty plea.

27        11.    I agree that this Agreement contains all of the promises and agreements between the

28 government and me, and I will not claim otherwise in the future. No modification of this Agreement

PLEA AGREEMENT           7

EXHIBIT 3
Page 52

1 | shall be effective unless it is in writing and signed by all parties.

2 |       12.    I agree that the Agreement binds the U.S. Attorney's Office for the Northern District of

3 | California only, and does not bind any other federal, state, or local agency.

4 | The Government's Promises

5 |       13.    The government agrees not to file any additional charges against the defendant that could

6 | be filed as a result of the investigation that led to the captioned Information.

7 |       14.    The government agrees to recommend a sentence at the low-end of the Guideline's range

8 | associated with the Guideline calculations set out in paragraph 7 above, unless the defendant violates the

9 | terms of the Agreement above or fails to accept responsibility.

10 | The Defendant's Affirmations

11 |       15.    I agree that my participation in the District Court's Conviction Alternative Program is not

12 | appropriate and that I will not request to be considered for and will not participate in that program as a

13 | result of my convictions for these offenses.

14 |       16.    I confirm that I have had adequate time to discuss this case, the evidence, and the

15 | Agreement with my attorney and that my attorney has provided me with all the legal advice that I

16 | requested.

17 |       17.    I confirm that while I considered signing this Agreement, and at the time I signed it, I

18 | was not under the influence of any alcohol, drug, or medicine that would impair my ability to understand

19 | the Agreement.

20 | //

21 | //

22 | //

23 | //

24 | //

25 | //

26 | //

27 | //

28 | //

EXHIBIT 3
Page 53

1        18.    I confirm that my decision to enter a guilty plea is made knowing the charge that has

2   been brought against me, any possible defense, and the benefits and possible detriments of proceeding to

3   trial.  I also confirm that my decision to plead guilty is made voluntarily, and no one coerced or

4   threatened me to enter into this Agreement.

5

6   Dated: _____3-24-17_____             _____

7                                             SHIV D. KUMAR
                                              Defendant

8

9                                             BRIAN J. STRETCH
                                              United States Attorney

10  Dated: ____3/24/2017_____               _____

11                                              JOSE APOLINAR OLIVERA
                                              Assistant United States Attorney

12                                            REBECCA SABLE
                                              Trial Attorney

13

14       19.    I have fully explained to my client all the rights that a criminal defendant has and all the

15  terms of this Agreement.  In my opinion, my client understands all the terms of this Agreement and all

16  the rights my client is giving up by pleading guilty, and, based on the information now known to me, my

17  client's decision to plead guilty is knowing and voluntary.

18

19  Dated: _3-24-2017_____             _____

20                                              ROGER PATTON
                                              CHRIS CANNON
                                              Attorneys for Defendant

21

22

23

24

25

26

27

28

EXHIBIT 3
Page 54

EXHIBIT 4

| | |
|---|---|
| **From:** | Roger Patton <rpatton@pwc-law.com> |
| **Sent:** | Tuesday, October 24, 2017 11:08 PM |
| **To:** | Sanjay Bhandari |
| **Subject:** | FW: Proposed Tolling Agreement |
| **Attachments:** | Kumar Tolling Agreement.pdf |

**From:** Olivera, Jose (USACAN) [Jose.Olivera@usdoj.gov]
**Sent:** Wednesday, August 10, 2016 6:15 PM
**To:** Roger Patton
**Cc:** Sable, Rebecca J. (TAX); Williams Chancelor
**Subject:** Proposed Tolling Agreement

Dear Mr. Patton,

As we discussed at our meeting on August 8, 2016, attached please find the proposed tolling agreement related to Shiv. D. Kumar. We understand that you will be meeting with your client this upcoming week. If you and Mr. Kumar agree to the proposed tolling agreement, please sign it and return it to me via email and U.S. mail by Friday, August 18, 2016. We look forward to your response. Please contact me if you have any questions.

Sincerely,

José Apolinar Olivera
Assistant United States Attorney
Northern District of California
450 Golden Gate Avenue
11th Floor Federal Building
San Francisco, California 94102
Phone: (415) 436-6888
Cell: (415) 806-3147
Fax: (415) 436-7009
E-mail: jose.olivera@usdoj.gov

EXHIBIT 4
Page 55

EXHIBIT 5

TELEPHONE
(415) 362-6252

FACSIMILE
(415) 362-6431

August 15, 2016

Reena Kumar
reenakumar123@aol.com

Sandeep Kumar
sundeepkumarbawa@yahoo.com

Re:    Retainer

Dear Reena and Sandeep,

I am writing to confirm our fee agreement in this case. I have agreed to represent you in connection with a tax evasion investigation of your family and associated entities, particularly including A-Para Transit, Inc.

My fee for that representation is $450.00 per hour. You have agreed to give us a retainer of $25,000.00 which we will bill against at the rate of $450.00 per hour. This is an "evergreen retainer." We will provide you with periodic billing statements and you agree to pay those statements promptly and bring the balance of your retainer up to $25,000.00.

This retainer arrangement anticipates resolving the case short of an actual court proceeding. If formal charges are filed, we will not appear on your behalf, following the initiation of formal charges unless we have sufficient funds in our trust account to cover anticipated attorneys' fees and costs, or we have come to a mutually satisfactory agreement to secure additional expected trial fees.

If this case is set for trial, and you do not deposit sufficient funds in our trust account to cover anticipated trial fees, YOU WILL NOT OPPOSE A MOTION ALLOWING ME TO WITHDRAW FROM FURTHER REPRESENTATION OF YOU.

These fees cover legal services only and do not cover an appeal, writ, investigation or expert services.

EXHIBIT 5
Page 56

Reena and Sandeep Kumar
Retainer
August 15, 2016
Page 2 of 2

    Because your employer is paying my fees, there may be a conflict of
interest between you and your employer.  You wish to waive any potential conflict
arising from your employer's payment of my fees.  Please consult with
independent counsel if you have any questions regarding the wisdom of waiving
this conflict.

    Under California Rules of Professional Conduct Rule 3-410, we are
required to inform you that we do not carry errors and omissions insurance
(malpractice) applicable to services to be rendered.

                                        Very truly yours,


                                        Christopher J. Cannon

    I have read, understand and agree to the above terms and I agree to waive
any conflict between the payer of the fees and myself.


                                        Reena Kumar



    I have read, understand and agree to the above terms and I agree to waive
any conflict between the payer of the fees and myself.


                                        Sandeep Kumar



    I have read and understand this retainer agreement and agree to pay the
legal fees required for representation of Reena and Sandeep Kumar.  I understand
that Chris Cannon is representing Reena and Sandeep Kumar and not A-Para
Transit, Inc.


                Authorized Agent for A-Para Transit Inc.

EXHIBIT 5
Page 57

TELEPHONE
(415) 362-6252

FACSIMILE
(415) 362-6431

August 15, 2016

Reena Kumar
Sandeep Kumar
reenakumar123@aol.com
sundeepkumarbawa@yahoo.com

Re:     CONFLICT OF INTEREST,
        ATTORNEY-CLIENT PRIVILEGED COMMUNICATION

Dear Reena and Sandeep,

As I have discussed with each of you, there may be an actual conflict of interest between your varied interests. We have discussed the details of this conflict. In order for me to continue to represent both of you, I must have a written waiver of the conflict of interest between the two of you. If both of you wish me to represent both of you, please sign and return this waiver to me.

An additional potential conflict would arise if Reena or Sandeep would want to point fingers at each other and blame one or both of the other parties for any action. If such a circumstance should arise in the future, obviously I could not continue to represent the party or parties with actively competing interests. If such a situation should occur, Reena and Sandeep agree that such a conflict would not be a disabling conflict—I would continue to be able to represent the other parties or party even though I had previously represented a party whose interest has become adverse to them. Moreover, because it may be impossible to represent one of you without using information obtained from the other, you both agree to waive the attorney-client privilege to the extent required to allow effective representation of the other party, specifically including cross-examination at trial.

EXHIBIT 5
Page 58

Each of you should feel free to discuss this issue with another attorney, if you have any doubts as to the wisdom of signing this conflict waiver.

Thank you for your attention to this matter.

Very truly yours,

Christopher J. Cannon

Chris Cannon has explained the conflict of interest between us to me and I wish to waive that conflict.

Dated: August 29, 2016

_____
Reena Kumar

Dated: August 29, 2016

_____
Sandeep Kumar

EXHIBIT 5
Page 59

EXHIBIT 6

## A-Paratransit Interview on July 11, 2012

**Location**: POA Dewey Watson's office

**Present at interview:**
- o   RA – James Ackerman
- o   RA – Matt Kirking
- o   POA – Dewey Watson
- o   Shareholder – Shiv Kumar
- o   Accountant – Reena Kumar (Shiv Kumar's daughter)
- o   Accountant – Gina Kumar (Shiv Kumar's daughter-in-law)

### Background

Mr. Kumar:

**What was your involvement in the corporation and when)?**
The corp began in 1992 -1993. In 2008-2010 his involvement in the day to day operations was not substantial.

**What is your education background and work history?**
Mr. Kumar stated that he had an eighth grade education which he received in India.

Daughters:
Who managed the corp. in 2008, 2009 and 2010?
An office manager named Sonia was employed by the corp as the office manager in the years in question (2008-2010) as well as earlier years. In 2008-2010 Gina Kumar and Reena Kumar began working in the corp to handle accounting functions; however, Sonja was still employed and was considered the "expert" in QuickBooks.

Reena Kumar (Shiv Kumar's Daughter)
Received AA in Business Admin in 2004 – worked in the optomology field.
In 2007 she was helping her mom who had cancer and returned to the business when Gina left due to her having a baby.
Her duties included opening mail posting entries into QuickBooks (QB), creating invoices in QB and posting checks / deposits to the invoice, paying bills and other BK activities.

Gina Kumar (Shiv Kumar's Daughter-in-law)
BS degree in Business Admin – attended school from 2008-2011
In 2008 she was pregnant and her involvement in the business was limited
Most of the QB usage was taught to her by Reena. Her duties included all of the duties which Reena handled.

Another manager was on site, named Pardeep; however, he was involved in the operations mostly. He has been with the corp since the beginning.

EXHIBIT 6   MOI000139
Page 60

MOI000139

## Books

1) **How were the books prepared in 2008-2010?**
   QuickBooks (QB) and Excel were used, see below for details.

2) **How many people are involved in the accounting / preparation of books?**
   Sonja, Reena and Gina

3) **How many people had access to the accounting software?**
   Only Sonja, Reena and Gina had access which was password protected.

4) **Explain the invoicing process.**
   Invoices are issued weekly. The invoices which are issued to Veolia are created in Excel. There is usually a 2-3 month lag period between the time that an invoice is issued and the time that payment on that invoice is received. Veolia will usually pay several invoices at the same time; however, there are usually separate checks related to each invoice. The checks are deposited by Reena or Gina.

5) **How are payments on invoices accounted for?**
   Entry is made into QB to post the deposit to the invoice which was created in QB.

6) **Who was responsible for booking received checks as income or posting them to outstanding invoices?**
   Reena or Gina

7) **In regards to the deposits which were not included on the tax return, how were they accounted for?**
   Deposits were made into the Bank of the West Account. No entries were made in QB. Reena stated that the same process occurred in 2009 and 2010; however a review of the BoW account statements in 2010 did not reveal total deposits which were consistent with the amount of unreported income (suggesting that the unreported income was not all deposited into the BoW account).

8) **How were the invoices which were related to the unreported deposits accounted for.**
   Reena stated that they were segregated from the other invoices.

9) **Reena, were you instructed to not record the income which was not reported?**
   5th

10) **Who made the deposits?**
    o BofA
    o BofW
    Reena, Gina

11) **Why was the Bank of the West account opened?**
    5th

12) **What was it used for?**
    5th

EXHIBIT 6 MOI000140
Page 61

MOI000140

13) **How was the determination made as to which checks deposits not to record as income?**
5th

14) **Who made that decision?**
5th

<u>**Tax Returns**</u>

15) **What documents did you provide to the return preparer for those years?**
P&L, G/L, B/S

16) **Were any adjustments made by staff at A-Para prior to providing them to Preparer?**
No

17) **Did the preparer make any adjustment?**
Reena believes that the preparer makes an adjustment to depreciation but she does not understand the nature of the adjustment.

18) **Who provided that information to him?**
Reena

19) **Was there a meeting or discussion when the documents were provided to the preparer?**
No



EXHIBIT 6   MOI000141
Page 62

MOI000141

EXHIBIT 7

| Taxpayer Name: | A-Paratransit Inc. | Examiner: | Ackerman, James |
|---|---|---|---|
| TIN: | 94-3245255 | | |
| Tax Form: | 1120 | Date: | 5/22/12 |
| Tax Year (s): | 200712, 200812, 200912, 201012 | | |

## Initial Interview Summary

Please record any interview questions or notes below.

**General:**

Location: POA's office

Present at interview:

- o RA – James Ackerman
- o POA – Dewey Watson

**Interview with POA Dewey Watson on 4/24/12**

The POA stated that there was a discovery of unreported income in years 2008 through 2010. He explained that the taxpayer was sued in 2008 by employees with the allegations involving insufficient documentation of breaks. During the lawsuit, the TAXPAYER was required to disclose its tax returns. POA stated that the S/H was concerned about losing the business so he reported less income on the 2008, 2009 and 2010 tax returns. The POA also stated that the S/H's wife died in 2008, the year in which the understatement began and that the 2011 F1120 is on extension. He believes that the suit was settled in 2011.

Agent inquired about the Bank of the West bank account and the POA contacted the taxpayer for clarification. The POA confirmed that payment from some of the taxpayer's invoices was deposited into the Bank of the West account instead of the Bank of America account.

Agent inquired as to what was provided to the original return preparer and whether the taxpayer received advice to omit income from his return. The POA believes that the books provided to the original return preparer did not reflect the omitted income. He is not aware of whether the taxpayer receive advice about the omission of income or who made the decision to omit the income

The POA stated that the taxpayer wants to cooperate in full, will provide amended returns for 2008, 2009 and 2010 and provide any necessary documentation to substantiate the amended returns. Agent inquired as to whether the taxpayer will provide consent to extend the statute for TY 2008 and the POA stated the taxpayer will.

**Discussion with POA Dewey Watson on 5/22/12**

"Amended Returns"

The POA provided copies of Forms 1120X along with the revised and original Forms 1120. He stated that the shareholder has signed the Forms 1120X; however, the preparer has not signed them because they were drafts.

EXHIBIT 8



**From:** Chris Cannon <chris@sugarmanandcannon.com>
**Date:** February 17, 2017 at 2:14:26 PM PST
**To:** "Roger Patton (rpatton@pwc-law.com)" <rpatton@pwc-law.com>,
"'shivkumarbawa@gmail.com'" <shivkumarbawa@gmail.com>
**Subject: Conversation with Jose**



He wants to get the plea done as quickly as possible, and I will be in in Africa from the 24th to the 13th so the plea might have to be done in my absence.

He again reaffirmed that while there are no formal promises other than those contained in the plea agreement, once Shiv pleads, the investigation is over and no other cases will be brought. He is just nervous that Shiv might say something about that on the record and does not want to be embarrassed.

So Shiv all of your family members can sleep well at night, just don't mention that at the time of the plea because that consideration is not a part of the formal deal, even though it is certainly part of the practical consideration. Please call me if you have any questions about this.

Chris

EXHIBIT 8
Page 64

Chris Cannon

Please note our new address

Sugarman & Cannon

737 Tehama, No. 3

San Francisco, Ca. 94103

Telephone: (415) 362-6252

Facsimile: (415) 362 6431

EXHIBIT 8
Page 65

EXHIBIT 9

| | |
|---|---|
| **From:** | Olivera, Jose (USACAN) |
| **To:** | Chris Cannon |
| **Subject:** | Re: USA v. Kumar: Analysis |
| **Date:** | Saturday, September 30, 2017 5:08:57 AM |

Chris, I can't agree to that.

He agreed to these figures and not dispute them. If he is going to claim that the tax loss is less than he agreed to, and say gross receipts for 2009 and 2010 are included in other years, then that is going to open up those years. For 2008 and 2011, the gross receipts unreported exceed those he is claiming are incorrect for 2009 and 2010. He is ignoring that benefit.

I have tried to be patient with him, but at this point I don't know how he can say he isn't going to be violating the plea agreement.


Sent from my iPhone

On Sep 29, 2017, at 7:53 PM, Chris Cannon <chris@sugarmanandcannon.com<mailto:chris@sugarmanandcannon.com>> wrote:

Jose,

   I am not trying to dispute the plea agreement, and the differences shouldn't make a difference at the end of the day, but both of us should make sure we have our facts right.

   What I am saying, however, is that the plea agreement says the Shiv underreported $2,229,217 and $2,412,435 in 09 and 10, when in fact, according to your numbers below, the underreporting was $2,099,630.01 and $1,794,385.58 for a total underreporting of 3,894,015.  When you multiply that number by 28% (2T1.1(c)(C), you get a total tax loss of 1,098,032, rather than the 1,584,000 as calculated in 2(f) of the plea agreement.

   Bringing the tax loss down, reduces the guidelines by two levels because the break is at 1.5 million and results in guidelines of 24-30, rather than the 30-37.

   I am not trying to get out of the plea agreement, but I do think we should get on the same page as to the actual numbers.

   We may want to say something like:

   The numbers in the plea agreement were the product of negotiation and compromise by both sides, the parties have discovered that the numbers in the plea agreement, potentially overstate the financial loss, and it is possible the guidelines should be two levels lower.  On the other hand, there are other issues and other years, that with additional investigation could potentially lead to a higher guideline calculation.  Due to this uncertainly, and because to the plea agreement, the parties do not object to the loss calculations in the PSR, which are based on the plea agreement, but acknowledgement that calculation could overstate the tax loss in 2009 and 2010.

   I had no wifi for a while and just got your email.  I will land in 10 and after about 8:45 your time, I should be on the road if you want to talk.

Chris
415 517 4586


From: Olivera, Jose (USACAN) [mailto:Jose.Olivera@usdoj.gov]

EXHIBIT 9
Page 66

Sent: Friday, September 29, 2017 6:47 PM
To: Chris Cannon <chris@sugarmanandcannon.com<mailto:chris@sugarmanandcannon.com>>
Subject: USA v. Kumar: Analysis

Chris,

I conducted an analysis on API's 2008 through 2010 original tax returns along with amended tax returns. I also reviewed bank records and the summaries I sent you previously. Below are charts and analysis.

You are correct in that not all of the money was transferred to the two investment/real estate companies, although a large part—more than 50% of the unreported gross receipts—were transferred to those companies. The tax loss is based on the total gross receipts API received. The tax loss is explained based on the arguments you have raised and I believe that the tax loss is correct and Mr. Kumar would be cautios in what he argues as it may violate our plea agreement. As I explain below, I think the tax loss is more than fair and I have tried to work with you and Defendant on this matter. I hope you and Mr. Kumar can appreciate that if he violates the plea agreement, I do not have to abide by the terms of the plea agreement. See paragraph 14 of the signed plea agreement.

I had hoped to file the supplemental sentencing memo today, but given our conversation, I want to confirm that you are not disputing the terms of the plea agreement. The draft I sent you currently represents that that the tax loss and unreported gross receipts in the plea are not in dispute. If Mr. Kumar intends to do that, I need to address that in the supplemental memo.

Each year is addressed below. Have a good weekend, Chris, and call me if you want to discuss.

jose

2009 GROSS RECEIPTS

Beginning with 2009, API received the following gross receipts in 2009.

Payer

Amount

Veolia

$6,992,208.68

Community Child Care

$3,270.00

Alameda County

$84,410.54

Regional Parks

$8,015.00

East Bay Regional Park

$1,735.00

EXHIBIT 9
Page 67

Total Gross Receipts

$7,089,639.22


This includes all payments issued by each payer in 2009, but not deposited in 2009. I looked at the Veolia $130,710.81 check and you are correct it was deposited in early January 2010. I also looked at the other payers to see what payments may also have been deposited in 2010. Those checks that API likely deposited in 2010 amount to $2,145. See table below.

Payer

Check #

Date

Amount

Alameda County

1697092
1696055

12/25/2009
12/24/2009

$130.60
279.80


East Bay Regional Park

Check 82827

12/30/2009

$1,735.00


Total



$2,145.40


Even if we were to reduce the gross receipts, we are talking about gross receipts of $727,344.22 ($7,089,639.22 + $183,805 (cash)) minus $130,710.81, minus $2,145, for total gross receipts amount for 2009 of $7,140,588.01. On his original tax returns he reported $5,040,958, which leaves unreported gross receipts of $2,099,630.01. The tax loss on that figure will be over $700,000. The tax loss here will be large as well. API took a deduction for fuel reimbursements on its original 2009 Form 1120, so that is not an issue.

EXHIBIT 9
Page 68

2010 GROSS RECEIPTS

Next, API received the following gross receipts in 2010.

Payer

Amount

Veolia

$7,754,698.28

Community Child Care

$3,800.00

Alameda County

$167,249.57

EB Regional Parks District

$5,695.00

Regional Parks Foundation

$4,990.00

Total

$7,936,432.85

This includes all payments issued by each payer in 2010, but not necessarily deposited by API in 2010. I looked at the Veolia checks you stated were paid in 2010, but deposited in January 2011. The three checks totaling more than $600,000 were deposited in 2011. I also looked at the other payers to see what payments may also have been deposited in 2011 and none fit the criteria for mid-to-late December 2010 payment. Combining all three checks you identified from Veolia that were paid on 12/21/2010 amount to a total of $622,877.27.

Even if we were to reduce the gross receipts, we are talking about gross receipts of $8,145,808.85 ($7,936,432.85 + $209,376 (cash)) minus 622,877.27, for total gross receipts of $7,522,931.58. On his original tax returns he reported $5,728,546, which leaves unreported gross receipts of $1,794,385.58. The tax loss here will be large as well. API took a deduction for fuel reimbursements on its original 2010 Form 1120, so that is not an issue.

As for API's amended tax returns, they would still be short gross receipts by over $150,000 for 2009 and over $100,000 for 2010.

2008 GROSS RECEIPTS

Finally, although not included in the plea agreement, we have conducted an analysis of 2008. API received the following gross receipts in 2008.

EXHIBIT 9
Page 69

Payer

Amount

Veolia

$6,036,524.54


Community Child Care

$6,960


Alameda County

$34,376.50


EB Regional Parks District

$8,752


Regional Parks Foundation

$2,530


Total

$6,089,143.04



This includes all payments issued by each payer in 2008. I looked at all checks, and the checks were issued no later than 12/11/2008 appear to have all been deposited in 2008. However, on API's original tax return, Kumar reported $5,568,148, along with full fuel reimbursements of more than $600,000. The difference here is more than $500,000 in gross receipts unreported. API took a deduction for fuel reimbursements on its original 2008 Form 1120, so that is not an issue.

Moreover, for 2011, there are unreported gross receipts of more than $400,000—see table below—and that does not include gross receipts received from Alameda County or any of the other entities API provided services for. It only includes gross receipts from Veolia/transdev.

Item

2011

Gross Receipts (includes $287,548 in cash received by API)

$8,325,620

Fuel Reimbursement Deduction

EXHIBIT 9
Page 70

($922,952.35)

Veolia Check 525601 (12/2010)

$139,709.07

Veolia Check 525602 (12/2010)

$332,754.45

Veolia Check 525603 (12/2010)

$150,413.75

Total Gross Receipts (Transdev Only)

$8,025,544.92

Amended Return Gross Receipts

$7,607,453.00

Underreported Amount On Amended Form 1120

$418,091.92


José Apolinar Olivera
Assistant United States Attorney
Northern District of California
Phone: (510) 637-3924

EXHIBIT 9
Page 71